**UNITED STATES COURT OF APPEALS**

**February 19, 2013**

**TENTH CIRCUIT**

THERESA JAMES, as wrongful death estate representative for Jay Murphy, Sr., deceased, and as custodial parent and next friend of her daughter, M., a minor,

       Plaintiff - Appellant,

v.

MARTIN J. CHAVEZ, III, individually and in his official capacity as Mayor of the City of Albuquerque; RAY SCHULTZ, individually and in his official capacity as Chief of Police of the City of Albuquerque; RUSSELL CARTER, individually and in his official capacity as an Officer of the Albuquerque Police Department "S.W.A.T. Team"; MICHAEL FOX, individually and in his official capacity as an Officer (Detective) of the Albuquerque Police Department; CITY OF ALBUQUERQUE, as an Albuquerque Police Department, a municipal entity organized under the laws of the State of New Mexico and its law enforcement agency; JOSH BROWN, an officer of the Albuquerque Police Department, individually,

       Defendants - Appellees.

No. 11-2246
(D.C. No. 1:09-CV-00540-JB-CG)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO** and **HOLMES**, Circuit Judges, and **BRIMMER**, District Judge.[**]

---

This case arises out of a standoff between James Murphy, Sr. and the Albuquerque Police Department ("APD") that ended when a SWAT team officer shot and killed Mr. Murphy in Mr. Murphy's home. Theresa James, as Mr. Murphy's estate representative and custodial parent of her and Mr. Murphy's daughter, brought a complaint in the United States District Court for the District of New Mexico regarding Mr. Murphy's death. However, this appeal does not involve the officer who fired the fatal shots, but rather another officer, Russell Carter, who fired a shot at Mr. Murphy earlier in the encounter and missed. Appellant claims that Officer Carter's errant shot and his subsequent order for the SWAT team to enter Mr. Murphy's house set in motion a chain of events that foreseeably resulted in the SWAT team killing Mr. Murphy, thus making Officer Carter liable.

---

[*]This order is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] The Honorable Philip A. Brimmer, U.S. District Judge, District of Colorado, sitting by designation.

The district court granted summary judgment in favor of Officer Carter, holding that Officer Carter did not seize Mr. Murphy under the Fourth Amendment by shooting at him, that his actions do not shock the conscience, and that exigent circumstances justified his decision to order the SWAT team to enter the house.

We affirm the district court's holding without reaching the Fourth Amendment issues, since this case can be resolved solely on the grounds that Officer Carter's actions did not proximately cause Mr. Murphy's death.

**I**

In the early afternoon of June 5, 2007, Mr. Murphy's neighbor, Arturo Bandera, called the APD and reported that Mr. Murphy was standing at his front door armed with a knife. Aplt. App'x at 126. Mr. Bandera requested that the police respond quickly. *Id.* Immediately after Mr. Bandera called the police, Mr. Murphy left Mr. Bandera's house in a green pickup truck. *Id.* APD dispatched an officer to the area, who spotted the green pickup truck. *Id.* at 127. The responding officer saw Mr. Murphy wave a knife out of the window of the truck and throw a beer bottle. *Id.* Mr. Murphy eventually drove back to his house, got out of the truck, yelled at the officer, and ran inside. *Id.* Mr. Murphy's ten-year-old son stepped outside the house in order to advise the officer of his father's

emotional state. *Id*. at 128.[1] The officer placed Mr. Murphy's son in the rear seat of his

patrol car for the child's safety and because he was a potential witness. *Id*.

Ten minutes later, after additional APD officers had arrived, Mr. Murphy came

outside holding a foot-long knife, a boom box radio, and a bottle of beer. *Id*. He told the

officers to release his son or someone would get hurt. *Id*. He approached one of the

officers and motioned as if he were going to throw the boom box at him. *Id*. He threw

the beer bottle at another officer, and it shattered in front of him. *Id*. Mr. Murphy also

threw the boom box at the officers, but it did not hit anyone. *Id*. He then retreated behind

his wrought iron front door, still holding the knife. *Id*.

One of the officers noticed a teenage girl, Mr. Murphy's daughter, looking out the

front window of the house. *Id*. at 129.[2] The APD used a public address system to direct

Mr. Murphy to allow the girl to leave the house, but Mr. Murphy refused. *Id*. An officer

---

[1] The district court did not make any findings regarding what Mr. Murphy's son said to the officers. Aplt. App'x at 128. Defendants assert only that "Murphy's son . . . exited [Mr. Murphy's house] in an attempt to advise the police of Murphy's emotional state." *Id*. at 29, ¶ 14. Appellant does not dispute that assertion. *Id*. at 98, ¶ 1. The only evidence in the record on this subject is from an interview conducted the evening of Mr. Murphy's death, in which his son told an APD Detective and an Agent of the New Mexico State Police that "[t]hey put me inside the car, man. And I told him, 'Don't hurt my dad, man. Don't shoot my dad. He ain't got no weapons. He ain't–he ain't gonna hurt nobody, man.'" *Id*. at 57.

[2] The record does not establish whether any of the officers knew at the time that she was Mr. Murphy's daughter. Aplt. App'x at 129, n.3. The lower court resolved this question in favor of appellant, inferring that the officers did know that the girl was Mr. Murphy's daughter and should have known he would be less likely to harm his daughter than an unrelated teenager. *Id*.

began negotiating with Mr. Murphy face-to-face, during which time his daughter came downstairs and tried to walk out of the house. *Id*. Mr. Murphy grabbed his daughter's arm and pulled her back inside, saying "You're not going anywhere." *Id*. at 130. APD officers then continued their attempts to negotiate the release of Mr. Murphy's daughter. *Id*.

Appellant does not dispute this sequence of events; however, she "denies that Mr. Murphy threatened or restrained his daughter from leaving, other than out of fear for her safety." *Id*. at 99. An affidavit from the daughter attests that "[w]hen he put his arm by me as we stood at the front door, it was to protect me from the police outside." *Id*. at 122. For the purposes of summary judgment, the lower court accepted as true the assertion that Mr. Murphy never threatened or harmed his daughter while they were in the house together. *Id*. at 130.

At this point, an officer asked the APD SWAT team to respond. *Id*. Officer Carter was one of the SWAT team members who arrived at Mr. Murphy's house after the call. *Id*. at 131. Acting on his own initiative, Officer Carter positioned himself in the upstairs bedroom of the house next door, where he could see into the second-story bedroom of Mr. Murphy's house. *Id*. at 132. Officer Carter knew that the police had been negotiating with Mr. Murphy regarding his daughter, but he did not know how the negotiations were proceeding or what had been said. *Id*. at 131.

At his deposition, Officer Carter explained the circumstances of what led him to shoot at Mr. Murphy. *Id*. at 117-18. From his position in the house next door, Officer

Carter saw Mr. Murphy in an upstairs room with his daughter. *Id.* Mr. Murphy was holding a knife. *Id.* Officer Carter saw Mr. Murphy approach his daughter with the knife raised over his head. *Id.* Believing that Mr. Murphy's daughter was in immediate danger of death or serious bodily injury, Officer Carter fired one round from his rifle at Mr. Murphy. *Id.* at 116-17, 133. The shot did not hit Mr. Murphy. *Id.* at 133. Mr. Murphy's daughter testified that, at the time the shot was fired, she was not in the room, but rather going down the stairs to get her father something to drink, and that she saw Officer Carter's bullet pass through the wall near her as she walked down the stairs. *Id.* at 122. For the purposes of summary judgment, the district court accepted as true the assertion that she was not in the room when Officer Carter fired at Mr. Murphy. *Id.* at 133.

After firing the single shot, Officer Carter immediately ordered the SWAT team to enter the house. City Defendants' Motion for Partial Summary Judgment No. II: Dismissal of the Estate's Fourth Amendment Excessive Force Claim Against Officer Brown at 4, ¶ 10.[3] SWAT team member Josh Brown, designated as the "point man,"

---

[3] In its memorandum opinion and order, the district court did not recite the facts of what caused the SWAT team to shoot Mr. Murphy. Such facts are found in the city defendants' second motion for partial summary judgment. Although not included in the appellate appendix, this motion is part of the record on appeal since it is one of the "original papers . . . filed in the district court." FED. R. APP. P. 10(a)(1); *see, e.g.*, *Milligan-Hitt v. Board of Trustees of Sheridan County School Dist. No. 2*, 523 F.3d 1219, 1231 (10th Cir. 2008) ("we retain the *authority* to go beyond the appendix if we wish, because all . . . documents and exhibits filed in district court remain in the record regardless of what the parties put in the appendix") (emphasis in original). The facts concerning Mr. Murphy's death are included here since they are material and undisputed. Appellant did not oppose defendants' second motion for summary judgment and did not dispute any of the facts that Officer Brown described concerning his encounter with Mr. Murphy.

entered through the front door and moved up the staircase to the second floor. *Id.* at 4, ¶¶ 11, 13. The staircase was narrow, and Officer Brown could not see the top of it because the stairs took a ninety-degree turn halfway up. *Id.* at 4, ¶ 14. As Officer Brown neared the top of the stairs, he encountered Mr. Murphy standing above him holding a microwave oven in his left hand and a foot-long knife in the other hand. *Id.* at 5, ¶¶ 16-17. As Officer Brown raised his arm to throw a noise-flash diversionary device, Mr. Murphy threw the microwave oven at Officer Brown, which struck Officer Brown in the elbow and thigh and caused him to drop the diversionary device. *Id.* at 5, ¶¶ 18-19. With several other SWAT team members blocking the path down the stairs and the device about to detonate at his feet, Officer Brown decided to move forward. *Id.* at 5, ¶ 20. Mr. Murphy then began slashing at Officer Brown with the knife, coming within inches of Officer Brown's face. *Id.* at 5-6, ¶¶ 21-22. Officer Brown fired his AR-15 rifle at Mr. Murphy, killing him. *Id.* at 6, ¶¶ 23-24.

Appellant filed a 42 U.S.C. § 1983 complaint alleging, in part, that certain members of the APD, the APD as a whole, and the Mayor of Albuquerque violated Mr. Murphy's rights under the Fourth and Fourteenth Amendments by causing his death. Aplt. App'x at 137. Of those claims, the ones relevant to this appeal are that Officer Carter (1) violated the Fourth Amendment by ordering the SWAT team to enter Mr. Murphy's home unlawfully; (2) violated the Fourth Amendment by using excessive force

Plaintiff's Response to City Defendants' Second Motion for Partial Summary Judgment at 1. The only facts in the second summary judgment motion that appellant disputed were those concerning Officer Carter's conduct. *Id.* at 2.

in shooting at Mr. Murphy and ordering the SWAT team's entry; and (3) violated the Fourteenth Amendment's guarantee of substantive due process by engaging in conduct that shocks the conscience, namely, shooting at Mr. Murphy and ordering the SWAT team's entry. Appellant's Br. at 3.

In their first motion for summary judgment, defendant-appellees sought dismissal of the above claims against Officer Carter on the grounds that he did not seize either Mr. Murphy or Mr. Murphy's daughter and that his actions do not shock the conscience. *Id.* In response, appellant argued that Officer Carter's decision to shoot at Mr. Murphy was unconstitutional because Mr. Murphy's daughter was not in imminent mortal danger at the time; that Officer Carter's decision to order the SWAT team's entry was objectively unreasonable; that Officer Carter's use of deadly force shocks the conscience; and that Officer Carter's actions legally caused Mr. Murphy's death. Plaintiff's Response in Opposition to Defendants' First Motion for Summary Judgment at 6.

The district court granted the defendant-appellees' first motion for summary judgment, holding that there was no seizure, that exigent circumstances justified the SWAT team's entry, and that Officer Carter's conduct does not shock the conscience. *Id.* Appellant bases her appeal on the grounds that: (1) Officer Carter's decision to order in the SWAT team was the proximate cause of Mr. Murphy's death and (2) the district court erred in finding that exigent circumstances justified the SWAT team's entry.

## II

A grant of summary judgment is reviewed de novo, considering the evidence in the light most favorable to the non-moving party. *Robert v. Bd. of Cnty. Comm'rs*, 691 F.3d 1211, 1216 (10th Cir. 2012). Summary judgment may only be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

"Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is . . . liable. . . . The requisite causal connection is satisfied if the defendant[s] set in motion a series of events that the defendant[s] knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) and *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)) (internal citations and quotation marks omitted). In order to prevail on her § 1983 claims against Officer Carter, appellant is required to show that Officer Carter's actions, namely, shooting at Mr. Murphy and ordering the SWAT team into the house, were both the but-for and the proximate cause of Mr. Murphy's death. *See Trask*, 446 F.3d at 1046.

Appellant's theory of causation is that Officer Carter knew or should have known that Mr. Murphy would react violently to the SWAT team's entry into his home because Mr. Murphy had the legal right to defend his home and because Officer Carter "acknowledged that Mr. Murphy was entitled to use deadly force to defend his home from invaders." Appellant's Br. at 19-21. Appellant also argues that Officer Carter knew

or should have known "how the SWAT team would react, and what the result would be." *Id*. at 21. Thus, appellant argues that Officer Carter, by firing the shot at Mr. Murphy and then immediately ordering the SWAT team to enter, set in motion a series of events that Officer Carter knew or should have known would lead to Mr. Murphy's death.

There is little doubt that Officer Carter's conduct was the "but-for" cause of Mr. Murphy's death since the chain of events culminating in the fatal shooting would not have occurred "but for" Officer Carter's conduct. *Id.* Defendants do not argue otherwise. However, defendants are not necessarily liable for all of the harm caused "but for" Officer Carter's actions. Instead, under basic principles of tort law, their liability is limited to the harm "proximately" or "legally" caused by their tortious conduct. *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995); RESTATEMENT (SECOND) OF TORTS § 431, 871 cmt. a (1965 and 1979). As part of the proximate cause analysis, a defendant is not liable for harm produced by a "superseding cause." *Id.* A superseding cause is one that is "not within the scope of the risk created by the actor's conduct." RESTATEMENT (SECOND) OF TORTS § 442B (1965). The proximate cause analysis applies to constitutional torts, as well. In civil rights cases, "a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability." *Trask*, 446 F.3d at 1046.

The first issue raised by appellant's causation theory is whether Mr. Murphy did, in fact, have a legal right to defend his home with deadly force. Mr. Murphy was not a homeowner defending his home against unknown intruders. Rather, it is apparent from the numerous interactions between Mr. Murphy and the people outside his home that he

-10-

knew they were police officers.  *See* Aplt. App'x at 29-32, ¶¶ 11, 16-23, 25-30, 34, and at

98-99, ¶¶ 1-2.  Appellant does not dispute this.  Instead, she asserts that "Carter

understood that Mr. Murphy might use deadly force in trying to defend his home from a

SWAT invasion, and knew that absent exigent circumstances, this is a homeowner's

right."  *Id*. at 100, ¶ 8.

Appellant's argument is based on a misunderstanding of New Mexico law.  In

New Mexico,

> [h]omicide is justifiable when committed by any person in any of the
> following cases:
>> A. when committed in the necessary defense of his life, his
>> family or his property, or in necessarily defending against any
>> unlawful action directed against himself, his wife or family;
>> B. when committed in the lawful defense of himself or of
>> another and when there is a reasonable ground to believe a
>> design exists to commit a felony or to do some great personal
>> injury against such person or another, and there is imminent
>> danger that the design will be accomplished[.]

N.M.S.A. §§ 30-2-7A and 7B.  Appellant cites no case holding that this defense is

available to a homeowner resisting an unlawful arrest or entry into his home, simply

because of its unlawfulness, by individuals he recognizes to be the police.  The rule is to

the contrary.  The New Mexico Supreme Court recognizes that "a private citizen may not

use force to resist a search by an authorized police officer engaged in the performance of

his duties whether or not the arrest is illegal."  *State v. Doe*, 583 P.2d 464, 467 (N.M.

1978); *see also State v. Phillips*, 203 P.3d 146, 152 (N.M. App. 2008) ("[F]orcible

resistance to an officer discharging his duties is unlawful regardless of whether or not the

officer is acting within his actual legal authority in seizing an individual."); *cf.* Model

Penal Code § 3.04(2)(a)(i) ("The use of force is not justifiable under this Section . . . to

resist an arrest that the actor knows is being made by a peace officer, although the arrest

is unlawful[.]").

The purpose of the rule regarding use of force against police officers discharging

their duties is to avoid violent confrontation and promote in its place the "orderly

settlement of disputes." *State v. Travison B.*, 149 P.3d 99, 102 (N.M. App. 2006). In

*Travison B.*, plaintiff was charged with battery on a police officer. *Id.* at 101. He argued

that the police officers' testimony that he tried to hit them after they entered his residence

should be suppressed because their entry violated the Fourth Amendment. *Id.* In denying

plaintiff's motion, the court held that, even assuming a Fourth Amendment violation had

occurred,

> societal interests . . . do not countenance an attack on police officers, provided
> that the officers were acting 'within the scope of what [they were] employed
> to do.' [*Doe*, 583 P.2d at 467]. When an officer is so acting, societal interests
> dictate the protection of the officer from attack by someone who may question,
> albeit reasonably, the legality of the officer's actions.[4]

---

[4]In an analogous context, New Mexico courts have declined to exclude
evidence obtained due to violent conduct by a suspect after an illegal stop or
entry. *Cf. State v. Jones*, 835 P.2d 863, 867 (N.M. App. 1992) ("Nonetheless, the
evidence of him shooting at the officers was still admissible because the officers
did not obtain that evidence by exploiting the illegal entry. We rejected as
'bizarre' the notion that the officers gained unlawful entry in order that the
defendant may have the chance to shoot at them. . . . Similarly, we will not
require suppression of the evidence of defendant's battery or evasion of the police
officers. There is no evidence that they stopped and frisked defendant in order to
have him hit them and then run away.").

*Id*. at 102.  The court went on to explain that the plaintiff's attempt to hit the officers "[a]lthough precipitated by the entry . . . constituted new criminal activity" not subject to the exclusionary rule.  *Id*.  The exclusionary rule, which "enforces the constitutional protections of the home and person against unreasonable searches and seizures," had to yield in that instance to the goal of preventing "violence and serious physical injury."  *Id*. at 101-02.  The court stressed the importance of peaceful dispute resolution, explaining that an "aggrieved person's rights lie in a civil action, not in a physical attack."  *Id*. at 102-03.  In light of New Mexico law, there is no reason to conclude that Officer Carter should have known that Mr. Murphy would confront the entering SWAT team members with deadly force because New Mexico law countenanced such action.  Moreover, mistaken beliefs that Officer Carter may have harbored regarding an individual's right to violently resist police entry do not change the legal character of Mr. Murphy's actions as a superseding cause of his death.

Rather than focus on the actions of Officer Carter, it is appropriate to consider the actions of Mr. Murphy immediately before his death.  Wrongful actions by the victims of constitutional torts can, in the proper circumstances, constitute superseding causes to defeat liability.  For example, in *Bodine v. Warwick*, plaintiff filed a § 1983 action claiming that state troopers illegally entered his home and used excessive force to arrest him.  At trial, the district court granted judgment to plaintiff as a matter of law on his illegal entry claim and then instructed the jury that it need not determine whether the defendants used excessive force since the illegal entry "rendered any use of force

-13-

unreasonable." at 394. Instead, the jury was asked to determine what harm plaintiff

suffered after being told that the troopers were liable for all harm that ensued. *Id*. at 400.

On appeal, the Third Circuit rejected the principle that an illegal entry rendered the

troopers liable for the harm caused by plaintiff's arrest, explaining that, even if the entry

was unlawful, the troopers would not be liable for everything that resulted from the entry

in the "'philosophic' or but-for sense," and "certainly would not be liable for harm that

was caused by [the troopers'] non-tortious, as opposed to their tortious, 'conduct,' such as

the use of reasonable force to arrest Bodine." *Id*. Writing for the court, then-Judge Alito

offered the following hypothetical:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause that would limit the officer's liability.

*Id*. (citations omitted). Thus, the troopers' civil liability for an illegal entry was limited,

to the same extent it would be for any other tortfeasor, to the harm proximately caused by

their wrongful conduct.

Our opinion in *Trask* cited the *Bodine* hypothetical in support of the proposition

that probation officers who set in motion a series of events leading to a person's arrest

and alleged injuries from such arrest could only be liable to the extent that they

-14-

proximately caused such injuries. 446 F.3d at 1046. In *Trask*, state probation officers conducted a "field inspection" at the home of Bliss, a probationer, and Trask, her boyfriend. *Id*. at 1040. No one answered when the probation officers knocked on the front door, but the officers saw someone moving inside. *Id*. One officer concluded that Trask was preventing Bliss from opening the door because Trask had a history of being abusive towards Bliss. *Id*. The probation officers asked for the assistance of local police. *Id*. Two officers responded. *Id*. The police officers detained Trask because he answered the door with two knives sheathed to his belt. *Id*. While Trask was detained, two probation officers and a deputy sheriff entered his house and, after an hour-long search, found Bliss under the bed, where she said Trask had directed her to hide. *Id*. The police officers then arrested Trask for obstructing an officer. *Id*. Given that it was later determined that Bliss was, in fact, not on probation at the time of the search, Trask alleged that the probation officers were liable for his allegedly unlawful detention and arrest by the police officers because the probation officers summoned the local police to the scene and falsely represented their authority to search the house. *Id*. at 1045. We analyzed Trask's unlawful detention and arrest claim from a causation perspective and held that, even if the probation officers' entry violated the Fourth or Fourteenth Amendment, the officers could not be liable unless their conduct proximately caused the local police officers' actions. *Id*. We then remanded the case to the district court so the factfinder could determine whether it was foreseeable that Trask would lie or otherwise take action justifying his arrest. *Id*. at 1047.

-15-

The court in *Cameron v. City of Pontiac*, 813 F.2d 782 (6th Cir. 1987), similarly held that lack of proximate causation defeated plaintiff's Fourth Amendment claim. In *Cameron*, police officers arrived at a house to investigate a reported burglary and observed two men leave the house and flee on foot. *Id*. at 783-84. The officers fired several shots at the two suspects, after which one of them surrendered. *Id*. at 784. The other suspect, Cameron, continued to run. *Id*. One of the officers ran after him and, when Cameron paused for a moment, fired another shot. *Id*. When additional officers arrived and blocked Cameron's escape, Cameron scaled a fence and ran onto an expressway, where he was hit by a car and killed. *Id*. Cameron's mother brought a § 1983 action alleging in part that the responding officers unjustifiably used deadly force trying to apprehend Cameron in violation of the Fourth Amendment. *Id*.

The Sixth Circuit affirmed the district court's dismissal of the action, holding that, "[e]ven if Cameron had been seized by unreasonable means, his estate could not recover unless the constitutional violation was a proximate cause of his death." *Id*. at 786. It affirmed the district court's conclusion that the moving vehicle was a "distinct, unrelated, unexpected, superseding, but efficient medium." *Id*. It further held that it was not reasonably foreseeable that, in attempting to escape from a lawful arrest, Cameron would climb a fence and descend onto an expressway. *Id*. The court affirmed the district court's grant of summary judgment to the officers in part on the ground that the officers' use of firearms did not proximately cause Cameron's death. *Id*.

Mr. Murphy's use of deadly force against the SWAT team is similar to the actions of the suspect in the hypothetical in *Bodine*. *See* 72 F.3d at 400. There, the suspect is injured as a direct result of trying to shoot a police officer. *See id*. Here, Mr. Murphy was shot and killed as a direct result of trying to stab a police officer. Thus, even if the actions of Officer Carter violated Mr. Murphy's constitutional rights, Mr. Murphy's unlawful and deliberate attack on the SWAT team constitutes a superseding cause of his death that defeats liability for the officer.[5] *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989) ("if Brower had had the opportunity to stop voluntarily at the roadblock, but had negligently or intentionally driven into it, then, because of lack of proximate causality, respondents, though responsible for depriving him of his freedom of movement, would not be liable for his death."); *Lamont v. New Jersey*, 637 F.3d 177, 185 (3d Cir. 2011)

---

[5] The unlawful nature of Mr. Murphy's conduct, as well as the importance of avoiding violent confrontation between police and civilians as a matter of policy, render Mr. Murphy's actions a superseding cause, regardless of whether his violent response was foreseeable. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 442(f) (1965) (identifying culpability as a factor in determining whether a cause is superseding); *Urbach v. United States*, 869 F.2d 829 (5th Cir. 1989) (holding that mental hospital was not proximate cause of patient's death when it helped him arrange a furlough trip to Mexico City where he was later imprisoned and murdered by cellmates because cellmates' conduct was culpable and thus a superseding cause); *Alston v. Advanced Brands & Importing Co.*, 494 F.3d 562, 565 (6th Cir. 2007) (holding that alcohol advertising was not the proximate cause of minor children's decision to illegally purchase alcohol because "[a] crime is an independent action. Indeed, our entire concept of criminal punishment is predicated on the idea that individuals are accountable for their own actions."). To apply a foreseeability analysis in the context of a hostage situation or stand-off would tend to impose liability on law enforcement officers for preparing for any contingency that could occur, which would be contrary to the public policy of law enforcement officers being properly prepared to resolve the confrontation.

("Like a tort plaintiff, a § 1983 plaintiff must establish both causation in fact and proximate causation."); *Burke v. McDonald*, 572 F.3d 51, 60 (1st Cir. 2009) ("§ 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions") (internal citations omitted); *Estate of Sowards v. City of Trenton*, 125 F. App'x 31, 42 (6th Cir. 2005) ("Sowards's own conduct of pointing the handgun toward the officers was the intervening or superseding cause that set in motion the events that ultimately led to his death. Therefore, the district court was correct in limiting the damages to only those actual injuries Sowards suffered as a result of the warrantless entry."); *Spearman v. Dutchess County*, No. 05-CV-148 (FJS/RFT), 2008 WL 2945991, at *5 n.11 (N.D.N.Y. July 25, 2008) ("A plaintiff's exercise of free will, which directly precipitates his own injury, may be a superseding act that breaks a chain of causation.").

Here, the lack of proximate causation defeats appellant's three claims. First, appellant alleges that Officer Carter violated the Fourth Amendment by ordering the SWAT team's unlawful entry into Mr. Murphy's home. Aplt. App'x at 125. Appellant, however, does not claim any injury separate from Mr. Murphy's death. Because his death was caused by his own acts, not those of Officer Carter, this claim is barred by the lack of proximate causation. The plaintiffs in *Trask* similarly claimed that an allegedly illegal search by probation officers rendered those officers liable for Trask's subsequent detention and arrest by local police. *See* 446 F.3d at 1045-46. We held that, assuming the search was illegal, the defendant probationers could nonetheless only be liable for

harm that the search proximately caused. *Id*. at 1046-47. Even if Officer Carter's conduct in shooting at Mr. Murphy and ordering the SWAT team to enter was unreasonable and not justified by exigent circumstances, Officer Carter is not liable for harm that was not proximately caused by that entry. *See id.*

Second, appellant alleges that Officer Carter used excessive force in shooting at Mr. Murphy and ordering the SWAT team's entry in violation of the Fourth Amendment. Aplt. App'x at 125. In *Cameron*, a similar claim for excessive force failed in part because plaintiff did not show that defendants' conduct proximately caused her son's death. 813 F.2d at 785-86. The same is true here.

Third, appellant alleges that Officer Carter's conduct in shooting at Mr. Murphy and ordering the SWAT team's entry shock the conscience in violation of the Fourteenth Amendment's guarantee of substantive due process. Appellant's Br. at 24. However, even if Officer Carter's actions shock the conscience, he is not liable for harm that those actions did not proximately cause. *See Trask*, 446 F.3d at 1046.

Given that appellant failed to raise a genuine issue of material fact showing that Officer Carter's actions were the proximate cause of Mr. Murphy's death, appellees are entitled to summary judgment on appellant's § 1983 claims.

## III

For the foregoing reasons, the judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT


Philip A. Brimmer
United States District Judge