PAMELA HARRIS, Circuit Judge,
concurring in part and dissenting in part:
This case began with an anonymous tip of drug activity at 408 High Street in Cambridge, Maryland, a duplex in which Andrew Cornish (“Cornish”) lived in the upstairs apartment. To investigate, the Cambridge police inspected the contents of trash bags left on the sidewalk in front of the residence. What they found, in bags associated with each of the two apartments, was trace amounts of marijuana and associated drug paraphernalia. Based on that discovery, they obtained search warrants for both apartments, and then assembled two Emergency Response Teams (commonly known as SWAT teams) — heavily armed, dressed in black, and carrying battering rams — to execute the warrants in the middle of the night. In Cornish’s apartment, they recovered two bags of marijuana.
They also, as the majority recounts, failed to knock and announce, their presence before breaking down the door to Cornish’s home, as required by the Fourth Amendment. And no more than a minute later, in the confusion that immediately followed their unannounced 4:30 a.m. entry on suspicion of marijuana use, the police shot and killed Cornish.
After a four-day trial, the jury found that the officers who executed the warrant in Cornish’s apartment (the “Officers”) did not properly knock and announce before *239 entering, and awarded Cornish’s father, Andrew Kane (“Kane”), damages of $250,000 for the death of his son caused by the knock-and-announce violation. Today, the majority sets aside that damages award on the ground that no reasonable jury could have found that the Officers’ unlawful execution of the search warrant was a proximate cause of Cornish’s death. I disagree, and respectfully dissent from that portion of the majority’s decision.[1]
I.
The tort-law principles that govern this case are a matter of common ground. It is clear, as the majority holds, that the jury could award damages for Cornish’s death only on a finding that it was proximately caused by the Officers’ knock-and-announce violation. Indeed, the jury was so instructed by the district court, and the court’s proximate cause instructions were never challenged by the Officers. And it follows that officers who unlawfully enter a home may not be held responsible for harm produced by a “superseding cause,” or some unforeseeable intervening event that breaks the causal link between entry and ultimate injury. See, e.g., Massey v. Ojaniit, 759 F.3d 343, 355 (4th Cir.2014) (analyzing proximate causation in the Section 1983 context).
Finally — and this is the crux of the matter — there is agreement that an attack on the Officers by Cornish, if it were knowing and deliberate, would constitute just such a superseding cause and thus insulate the Officers from liability for Cornish’s death. See Maj. Op. at 236.[2] Both district courts to review the case endorsed that premise, and for good reason. As the cases cited by the majority uniformly hold, when a resident reacts violently to an unlawful police entry, knowing full well that he is dealing with the police, that intentional act of aggression is a superseding cause of any resulting harm to the resident. See, e.g., Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir.1995); Maj. Op. at 236. As the first district court to consider this case explained: “If Cornish knew that the intruders were the police when he advanced on them, there can be no recovery for his death,” because the Officers are not liable “for harm produced by a superseding cause, such as an occupant’s knowing decision to attack them.” J.A. 53.
The pivotal question, then, is whether Cornish in fact knew that the men who broke into his home at 4:30 a.m. were police officers — or, more precisely, whether the evidence presented at trial compelled such a finding. The majority answers that question in the affirmative, holding that based on the record evidence, “Cornish must have known that the men were police officers, yet advanced on them” with a sheathed knife anyway. Maj. Op. at 236. It is on that narrow but important point that we disagree. For the reasons outlined below, I believe there was ample evidence from which a jury could conclude that in the minute that elapsed after the officers unlawfully broke down his door and before he was shot, Cornish never realized that he was confronting the police. '
II.
A.
Because we “accord the utmost respect to jury verdicts and tread gingerly in re *240 viewing them,” a party challenging the result reached by a jury — like the Officers here — “bears a hefty burden.” Price v. City of Charlotte, N.C., 93 F.3d 1241, 1249, 1250 (4th Cir.1996). We must view the evidence presented at trial in the light most favorable to Kane, the prevailing party, and draw all reasonable inferences in favor of the jury’s verdict. Durham v. Jones, 737 F.3d 291, 298 (4th Cir.2013); ABT Bldg. Prods. Corp. v. Nat’l Union Fire Ins. Co. of Pittsburgh, 472 F.3d 99, 113 (4th Cir.2006). And we cannot reject the jury’s conclusions simply because we would have reached different ones: “If reasonable minds could differ about the verdict, we are obliged to affirm.” King v. McMillan, 594 F.3d 301, 312 (4th Cir.2010).
In applying this standard, we must keep in mind that it is the Officers, not Kane, who bore the burden of proof on the dis-positive question. In tort law, a superseding cause acts as an affirmative defense, and the defendant bears the burden of proving its existence. See In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21, 45 (1st Cir.2013); Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 773 n. 4 (3d Cir.2009); BCS Servs., Inc. v. Heartwood 88, LLC, 637 F.3d 750, 757 (7th Cir.2011); Beck v. City of Upland, 527 F.3d 853, 863 (9th Cir.2008). It was up to the Officers, that is, to prove that Cornish’s advance on them was knowing and intentional, thus-qualifying it as a superseding cause — and not Kane’s obligation to prove otherwise. So whether Kane’s evidence on Cornish’s state of mind at the crucial moment is inconclusive, Maj. Op. at 236, is beside the point. What matters is whether a reasonable jury could have found that the Officers’ evidence was inconclusive, and that they had failed to prove that Cornish was aware of their identity before he died.[3]
B.
Drawing every reasonable inference in favor of the jury’s verdict, as we must, I can find no reason to second-guess the jury’s judgment on this score. For three principal reasons, I believe there was more than sufficient evidence from which a reasonable jury could have concluded that Cornish need not have known that the men who forced their way into his apartment at 4:30 a.m. were police officers, and could have died while running toward his door to investigate the source of the violent break-in.
First, at the moment he heard the commotion at his front door, Cornish simply had no reason to expect that it might be the police. Indeed, thanks to the knock- and-announce rule, he was entitled to and likely did assume the opposite: that if somebody was coming crashing into his home at 4:30 a.m. without knocking and announcing, it must be someone other than the police.
*241 Certainly there is nothing about the facts of this case that would have deprived Cornish of the right to rest on that presumption. Cornish was not some drug kingpin who might be on notice as to the possibility of an unannounced police raid. On the contrary, Cornish enjoyed a cordial relationship with the police; one of the Officers testified that while on duty he would occasionally stop by Cornish’s building and share a Pepsi with Cornish on the front porch. And as noted above, as to Cornish, this was a case about trace amounts of marijuana found in a trash rip, which ultimately led to the seizure of a small quantity of marijuana in Cornish’s apartment — not exactly the stuff of no-knock nighttime SWAT raids.
The point, to be clear, is not to take issue here with the Officers’ decision to execute a search warrant based on marijuana traces by way of a military-style nighttime raid. All that matters for this case is that Cornish could have had no reason to expect such a raid, and that the jury understood as much. As a Cambridge police officer testified, the department typically does not execute narcotics warrants at 4:80 a.m., and in cases involving marijuana use, typically does not seek warrants at all. J.A. 812-13. Add to that the fact on which the jury verdict rests— that the Officers failed to knock and announce their presence before breaking down Cornish’s door, as they were required to do by law — and the jury very reasonably could have concluded that Cornish would have presumed that the intruders in his home were not the police.
Second, the events in question unfolded so quickly, and under conditions so conducive to confusion and mistake, that a jury readily could find that Cornish never had a chance to reassess the situation and properly identify the Officers. This was no drawn-out encounter between police and suspect, giving each the opportunity fully to appraise the situation, as in many of the cases cited by the majority.[4] According to Officer testimony, this encounter lasted for all of one minute — one minute, possibly less, between the first bang on Cornish’s door and the final shots. J.A. 884. Cornish, who was in his bedroom and presumably asleep, had one minute to wake up, register and assess the commotion, decide how to respond, and then, as the majority describes, find a sheathed knife and cross the approximately 16 feet between his bedroom and the area near the front door, where he was shot. Even under the best of circumstances, that does not leave a lot of time to discern and comprehend all of the details.
And these were decidedly not the best of circumstances. It was, for one thing, the middle of the night. The jury certainly could have inferred that Cornish, likely awakened from sleep, would have been startled, confused, . and frightened. Though the Officers testified that the living room through which Cornish traveled was “illuminated,” to use the majority’s word, by a small tube-style television left on when Cornish retired, it was dark enough that at least one of the Officers took the opportunity to turn on a flashlight after the shooting, and another testified that he may have been using the light attached to his gun. And the Officers, by their own testimony, were moving rapidly *242 and shouting loudly, making the situation volatile as well as confusing.
Those are precisely the circumstances— “tense, uncertain, and rapidly evolving”— under which we give police officers the benefit of the doubt when it comes to their perceptions. Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In evaluating the use of force by officers, we make allowances for the fact that such situations can be exceptionally confusing and fast-moving, with officers required to make split-second judgments under suboptimal conditions. See id.; Waterman v. Batton, 393 F.3d 471, 478 (4th Cir.2005); Anderson v. Russell, 247 F.3d 125, 130-31 (4th Cir.2001); Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir.1996). In the context of a rapid-deployment and high-pressure nighttime raid, police officers cannot be held to “the 20/20 vision of hindsight,” Graham, 490 U.S. at 396, 109 S.Ct. 1865 and must instead be judged under a more forgiving standard.
Indeed, the Officers here argued as much to the jury, in defending against Kane’s claim for excessive force. According to the Officers, for instance, events in the apartment were so fast-moving and conditions for observation so poor that they could not discern — nor be expected to discern — that what Cornish held in his hand was a knife in a sheath and not, as they thought at the time, an unsheathed knife, or perhaps a machete or a pipe. The jury apparently credited that account, and decided the excessive force claim against Kane. There is no reason I can think of that the same jury could not apply the same standard to Cornish — who, unlike the Officers, had the benefit of neither training nor advance warning when he found himself caught up in the tumult of a military-style nighttime raid — and assume that Cornish, too, would be unable to exercise the powers of careful discernment that could be expected under less fraught circumstances.
Against all of this, the majority posits that the Officers’ SWAT apparel necessarily would have alerted Cornish to their identity.[5] But we are not talking, of course, about the traditional and easily recognizable blue police uniform. These Officers were clad all in black, for stealth rather than ease of identification. The Officer who confronted and shot Cornish— of the four, the Officer whose appearance, is most crucial here — was not in fact dressed in SWAT gear, J.A. 893, but rather a black sweatshirt or t-shirt, and his badge was the only police marking he testified to wearing, J.A. 593. One of the other Officers testified that he, too, was without a helmet, and instead wore a baseball cap, as well as a black sweatshirt with a police “emblem” on the left breast and a vest with a “police patch” on the right. J.A. 554. Another testified that in addition to a military-style helmet and goggles, he wore a vest that somewhere displayed the word “police,” J.A. 893, from which the jury could infer that he had in mind the same “police patch.” And the single Officer who testified that he was wearing a vest with the word “police” in “bright white letters” was, by his own account, out of Cornish’s sight during the entire encounter. J.A. 646. From this evidence, a reasonable jury could have concluded that the Officers had not met their burden of *243 proving that, in the heat of the moment and by the light of a television, their patches or badges or any other identifying features would have been visible and recognizable to Cornish.
Nor, it bears noting, should it be at all surprising that police officers might find it difficult to convey their identity in the confusion that inevitably follows an unannounced home entry. That is precisely the point of the knock-and-announce rule, which recognizes that “an unannounced entry may provoke violence in supposed self-defense by the surprised resident.” Hudson v. Michigan, 547 U.S. 586, 594, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). There is a reason we have a knock-and-announce rule and not, say, a wear-a-badge rule: Once officers breach the door unannounced, as the tragic facts of this case make clear, it is too late to count on badges or other forms of notice to prevent the surprised and violent conflict with which the rule is concerned.
Third and finally, there is the credibility of the Officers’ trial account, in which Cornish knowingly advanced on the Officers. It is the province of the jury, of course, to weigh the credibility of trial witnesses. See United States v. Dinkins, 691 F.3d 358, 387 (4th Cir.2012). And here, that credibility was very much at issue during the trial, given that the Officers never conceded the knock-and-announce violation found by the jury. For instance, the Officers testified that they gave Cornish a form of notice by forcing open the exterior door to his building with a 25-pound battering ram, generating noise he would have heard from his upstairs apartment. On the other hand, the exterior door showed no visible signs of any damage, and Cornish’s downstairs neighbors testified that they never heard any noise at that door. The district court specifically instructed the jury that it could consider this evidence for purposes of “judging [ ] the credibility” of the Officers, J.A. 1062, and we should assume, drawing all inferences in Kane’s favor, that it did exactly that.
A reasonable jury also could have considered the inherent plausibility of an account that had Cornish knowingly advancing on a heavily armed SWAT team while carrying a knife still in its sheath. This, too, was a major focus of the trial, with Kane arguing throughout that imputing awareness of the Officers’ identity to Cornish simply “defies common sense.” J.A. 972. The jury knew that Cornish had a cooperative and friendly relationship with the police, that he suffered from no mental infirmity, and that he was not under the influence of drugs or alcohol on the night he died, and it was free to infer that he would have had no reason to take on the Officers had he known their identity.
To be fair, the jury also had the benefit of the Officers’ response to Kane’s argument from common sense: “[Pjeople do [ ] irrational things.” J.A. 996. But it was not incumbent on the jury to find that explanation compelling. Viewed in the light most favorable to Kane, the evidence at trial allowed for a different conclusion, which a reasonable jury might - find more plausible: that because the Officers failed to knock and announce before entering Cornish’s apartment at 4:30 a.m., as required by law, Cornish died before he could identify the intruders he was confronting as police officers.
That precise sequence of events — a surprised and defensive reaction by a resident, to which the police respond with force — is exactly what the knock-and-announce rule is intended to prevent. Hudson, 547 U.S. at 594, 126 S.Ct. 2159; see also McDonald v. United States, 335 U.S. 451, 458-61, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (Jackson, J., concurring). To my. *244 mind, the jury’s verdict in this case represents a substantially supported and eminently reasonable effort to hold police officers accountable for an unnecessary death — one that could have been avoided had the Officers complied with their Fourth Amendment obligation to announce themselves before breaking into Cornish’s apartment in the middle of the night. I would not disturb the jury’s verdict in this case, and would affirm the district court’s judgment in full.

. I agree fully with the majority’s disposition of the Officers’ claim to federal qualified immunity and state-law immunity, as well as its determination that there was no error in the district court's instructions to the jury.

. Citations to "Maj. Op.” refer to the majority slip opinion.

. As Bodine and all of the other precedent cited by the majority make clear, the existence of a superseding cause is the only proximate-cause question in this case and cases like it. See Bodine, 72 F.3d at 400 (no proximate causation because resident's reaction is superseding cause); see also Brief of Appellants at 38-41 (citing Bodine and cases following it to argue against proximate cause solely on the ground that Cornish’s knowing attack on Officers was a superseding cause); J.A. 53 (district court holding that Officers cannot be held liable for Cornish’s death if Cornish's reaction qualifies as a superseding cause). Because violence in the wake of an unannounced home entry is eminently foreseeable, see Hudson v. Michigan, 547 U.S. 586, 594, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (explaining rationale for knock-and-announce rule), the standard for proximate cause is met unless the Officers can show the existence of a superseding cause that will insulate them from liability.

. See, e.g., James v. Chavez, 511 Fed.Appx. 742, 743-45 (10th Cir.2013) (resident who responded to officer approaching his home by waving a knife and forcing his daughter to stay inside the house is ultimately killed in standoff with SWAT team); Estate of Sowards v. City of Trenton, 125 Fed.Appx. 31, 33-34 (6th Cir.2005) (officers chased resident to the door of his apartment, interacted with resident at door; resident stated that he had a "surprise” for the officers and pointed a gun at them when they entered).