**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 14-1027**

———————————

ANDREW KANE, Individually and as Personal Representative of
the Estate of Andrew Dwayne Cornish,

Plaintiff - Appellee,

v.

BRIAN LEWIS; OFFICER JOHN LEWIS; OFFICER JENSEN SHORTER;
OFFICER LEAF A. LOWE; KENNETH MALIK, Individually and in his
Official Capacity as Chief of Police for the Cambridge
Police Dept.; THE COMMISSIONERS OF CAMBRIDGE, A Body
Corporate and Politic,

Defendants - Appellants.

———————————

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   J. Frederick Motz, Senior District
Judge.  (1:08-cv-01157-JFM)

———————————

Argued:  December 10, 2014              Decided:  March 13, 2015

———————————

Before DUNCAN, AGEE, and HARRIS, Circuit Judges.

———————————

Affirmed in part, vacated in part, and remanded with
instructions by unpublished opinion.  Judge Duncan wrote the
opinion, in which Judge Agee joined.  Judge Harris wrote a
separate opinion concurring in part and dissenting in part.

———————————

**ARGUED:** Victoria M. Shearer, KARPINSKI, COLARESI & KARP, P.A.,
Baltimore, Maryland, for Appellants.  Terrell Roberts, ROBERTS &
WOOD, Riverdale, Maryland, for Appellee.  **ON BRIEF:** Daniel Karp,

KARPINSKI, COLARESI & KARP, P.A., Baltimore, Maryland, for Appellants.

———————————

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This appeal is the second to come before us in a 42 U.S.C. § 1983 challenge to Maryland police officers' alleged use of excessive force and failure to properly knock and announce at the residence of Andrew Cornish on May 6, 2005. The jury found in favor of the police (the "Officers") on the excessive force claim, and in favor of Plaintiff-Appellee Andrew Kane, on behalf of his deceased son, Cornish, on the knock-and-announce claim. For the reasons that follow, we vacate the portion of the district court's judgment awarding Kane monetary relief in the amount of $250,000 and remand for an entry of an award of nominal damages only. We affirm the judgment of the district court on all other grounds.

I.

We take many of the facts and much of the procedural history from our prior opinion, adding to them as necessary. See Kane v. Lewis, 483 F. App'x 816 (4th Cir. 2012) (unpublished). In this exposition, we indicate where the facts are in dispute.

A.

On May 6, 2005, the Officers set out to execute warrants at 408 High Street in Cambridge, Maryland, a residence consisting of an upstairs apartment and a downstairs apartment. Andrew

3

Cornish and Bradrick Cornish ("Brad") occupied the upstairs apartment, Apartment B. The Officers wore clothing "display[ing] the word 'police,' and had their badges clipped to or screen printed on their shirts." J.A. 36; see also J.A. 554.

The Officers testified that they breached the exterior door of the building at approximately 4:30 a.m. J.A. 534. The four officers assigned to search Apartment B--Officer Jensen Shorter, Detective Brian Lewis, Detective Leaf Lowe, and Sergeant John Lewis--climbed the stairs and lined up outside of the apartment. They allege that they pounded on the door two separate times, yelling "Cambridge Police, search warrant" and pausing one to two seconds after each set of knocks, and that they used a sledge hammer to knock down the apartment door when there was no response. J.A. 828-29; see also J.A. 553. The downstairs residents testified that they did not hear the police announce themselves at Cornish's door. See J.A. 457-59, 288.

Officer Shorter was the first inside Cornish's apartment. The exterior apartment door opened into the kitchen. A door on the left side of the kitchen led to the living room and master bedroom. The door between the kitchen and living room was 16.5 feet away from the master bedroom door. J.A. 243. A second bedroom and a bathroom were located to the right of the kitchen. The apartment was illuminated by a light in the kitchen and a

4

television set in the living room, both of which were turned on at the time of the search.  See J.A. 38, 570, 602, 639-40.

The following facts are drawn from the Officers' testimony. Upon entry into the apartment, Officer Shorter headed left toward the living room and master bedroom, followed by Detective Lewis.  Detective Lowe and Sergeant Lewis moved to the right side of the apartment towards the second bedroom.  Officer Shorter and Detective Lewis testified that they shouted "Cambridge Police, search warrant" as they entered the apartment and headed towards Cornish's master bedroom door.  See J.A. 853-54.  The master bedroom door was closed, and Officer Shorter unsuccessfully attempted to kick it down.  After the Officers had been in Cornish's apartment for about "30 seconds," the master bedroom "door fl[ew] open" and knocked Officer Shorter off balance to the right side of the doorway.  J.A. 856-57. Officer Shorter lost sight of Detective Lewis at that point, but testified that he saw Cornish charging across the living room with a knife.  Detective Lewis testified that Cornish emerged from the master bedroom with a knife, swinging it in a "back and forth" motion, and crossed the living room towards him at a "steady pace."  J.A. 859.  Detective Lewis backpedaled "15 feet or more" to the kitchen while yelling at Cornish repeatedly to "drop the knife."  J.A. 858-59.  Cornish was approximately three feet away when Detective Lewis backed into an object in the

5

kitchen and was unable to retreat further. At this point, Detective Lewis fired two shots at Cornish.

The first shot hit Cornish in the cheek, and the second hit Cornish's forehead, fatally wounding him. Cornish's body landed halfway through the doorway between the kitchen and the living room--in other words, a distance from his master bedroom amounting to the length of the living room. See J.A. 243. A 15-inch knife, still in its sheath, was recovered from underneath his right leg.

On May 5, 2008, Kane filed a complaint in his individual capacity and as representative of Cornish's estate in the U.S. District Court for the District of Maryland. As relevant here, Kane sued under 42 U.S.C. § 1983, alleging that the Officers violated the Fourth Amendment by using excessive force and failing to knock and announce their presence. Kane sought damages for wrongful death and physical and emotional pain and suffering.

The Officers moved for summary judgment, arguing that their actions were protected by qualified immunity. The Officers claimed that they knocked and announced their presence prior to breaching both the exterior door at 408 High Street and the interior door to Cornish's apartment. Kane, on the other hand, claimed that the officers failed to knock and announce at either

6

door, thus failing to alert Cornish to the fact that the men forcefully entering his apartment were police officers.

The district court granted the Officers' summary judgment motion in part and denied it in part. Kane v. Lewis, No. 08-cv-1157, 2010 WL 1257884, at *6-7 (D. Md. Mar. 26, 2010). With respect to the issues before us, the district court held that Detective Lewis was entitled to qualified immunity on the excessive force claim because a reasonable officer under the circumstances could have believed Cornish presented a deadly threat as he approached the Officers with a knife. The court, however, denied summary judgment on Kane's knock-and-announce claim, finding it based on a genuine issue of material fact.

As the case progressed toward trial, the Officers filed a motion in limine seeking to limit the type of damages a jury could award Kane were it to find that the Officers violated the knock-and-announce rule. By order dated July 9, 2010, the district court concluded that Kane could recover nominal damages for such a violation and, separately, damages for the emotional distress Cornish experienced from the time the Officers entered his home until his death. The court held that Kane could not recover wrongful death damages for Cornish's death itself because the evidence suggested that Cornish "must have known that the men in his apartment were police officers but advanced on them nonetheless, and that no reasonable jury could conclude

7

otherwise." J.A. 79. The court determined that Cornish's conduct constituted a superseding cause of his death that extinguished monetary liability for these damages.

As a result of this order, the case was set to proceed to trial to resolve two questions: First, whether the Officers knocked and announced prior to entering Cornish's apartment. If the jury determined that they did not, Kane would be entitled to nominal damages for the violation of Cornish's rights. Then, the jury would have to resolve a second question: whether to award actual damages to Kane to compensate for Cornish's emotional distress prior to his death.

On April 4, 2011, the day of trial, Kane voluntarily dismissed with prejudice his § 1983 claims for damages for pain, suffering, and emotional distress. Kane then sought to appeal the partial grant of summary judgment and the order limiting damages. The Officers cross-appealed.

We dismissed both appeals for lack of jurisdiction. See Kane v. Lewis, 483 F. App'x 816 (4th Cir. 2012). We held that Kane's appeal was premature because there remained a genuine factual dispute over "whether the officers knocked and announced prior to entering Cornish's apartment." Id. at 822. Indeed, we noted that Kane might still "be able to recover nominal damages under § 1983 for the violation of Cornish's constitutional rights" if the jury determined that the Officers failed to knock

and announce.  Id.  We also held that this factual dispute precluded review of the Officers' cross-appeal because Defendants' qualified immunity defense would require the resolution of disputed facts.  See id. at 822-23.

B.

On remand, Kane asked the court either to reconsider its ruling denying wrongful death damages or to enter summary judgment in favor of Kane on his knock-and-announce claim.  The court denied the request and set the case for trial to "determine whether a knock-and-announce violation occurred." J.A. 83.

On December 7, 2012, the case was reassigned to a different district court judge[1] and Kane made the same request that the previous court had denied.  The second district court reversed several of the prior rulings.  Significantly for our purposes, instead of allowing trial to proceed solely on the knock-and-announce issue, the second district court also permitted the jury to "consider the excessive force claim and the claim for wrongful damages arising from the alleged unlawful entry."[2]  J.A. 84.

---

[1]  For ease of reference, we shall refer to this as the second district court.

[2]  The claim for emotional distress, having previously been dismissed with prejudice at Kane's request, was not reinstated (Continued)

9

At the close of trial, the jury returned a verdict in favor of Kane on the knock-and-announce claim, but found in favor of Detective Lewis, the officer who fired the fatal shot, on the excessive force claim. The jury awarded non-economic damages in the amount of $250,000 for wrongful death associated with the knock-and-announce violation and the district court entered judgment pursuant to this verdict.

The district court denied in part and granted in part the Officers' subsequent motion to alter or amend the judgment. It held that the excessive force verdict did not conflict with the knock-and-announce verdict because the Officers "created an unnecessary risk of harm to Cornish by their violation of the knock and announce rule." J.A. 1110.

The district court also denied the Officers qualified immunity, holding that the law with respect to the Officers' duty to knock and announce in these circumstances was clearly established. This appeal followed.

II.

On appeal, the Officers claim that they are liable only for nominal damages arising out of their failure to properly knock and announce and that they are entitled to qualified immunity on

_____

by the second district court, nor could it have been at that point in the case.

10

the knock-and-announce claim.  We devote our attention to the knock-and-announce and qualified immunity issues because they were the primary focus of this appeal, and consider each argument in turn.[3]

As a threshold issue, however, we must first determine the governing standard of review.  The Officers' motion to alter or amend the judgment, the denial of which they appeal here, cites both Rule 50 and Rule 59 of Federal Rules of Civil Procedure, and the district court did not identify either authority in its ruling.  See J.A. 1108-10.

Although the Officers styled their motion as one to alter or amend the judgment, it is more appropriately viewed as one under Rule 50(b).  The Officers moved for judgment as a matter of law under Rule 50(a) before the jury retired to deliberate, arguing that Detective Lewis's use of force was justified as a matter of law and, as a consequence, that Kane could recover only nominal damages on the knock-and-announce claim.  See J.A. 734 (moving for judgment as a matter of law at close of Kane's evidence), J.A. 907-08 (renewing the motion at the close of the Officers' evidence).  The district court denied the motions.  See J.A. 763, 908.  Following the jury's verdict--and as contemplated by Rule 50(b)--the Officers filed this post-

---

[3] We have considered the Officers' challenges to the district court's jury instructions and find them without merit.

11

judgment motion raising the same arguments. See Mem. Supp. Defs.' Mot. Alter Am. J., Kane, No. 08-cv-01157 (D. Md. Nov. 7, 2013), ECF No. 199-1. Accordingly, we consider the Officers' motion to alter or amend the judgment under Rule 50(b). See Cosgrove v. Bartolotta, 150 F.3d 729, 732 (7th Cir. 1998) (holding under similar circumstances that a motion styled as a Rule 59(e) motion was properly treated as a Rule 50(b) motion).

We review a district court's denial of a Rule 50(b) motion de novo. See White v. Cnty. of Newberry, S.C., 985 F.2d 168, 172-73 (4th Cir. 1993). A Rule 50(b) motion should be granted if a district court determines, without considering the credibility of the witnesses or weighing the evidence, that substantial evidence does not support the jury's findings. See id. at 173. In reviewing a district court's decision on a Rule 50(b) motion, "we view the evidence adduced at trial 'in the light most favorable to the prevailing party,'" Durham v. Jones, 737 F.3d 291, 298 (4th Cir. 2013) (quoting Sloas v. CSX Transp., Inc., 616 F.3d 380, 392 (4th Cir. 2010)), and "reverse only if 'the evidence favoring the [plaintiff] is [not] legally sufficient to overcome the defense,'" id. (alterations in original) (quoting Ortiz v. Jordan, 131 S. Ct. 884, 889 (2011)).

### A.

We turn now to the Officers' primary argument on appeal-- that the district court erred by failing to remit the jury's

12

damages award in favor of Kane on the knock-and-announce claim to nominal damages. For the reasons that follow, we agree.

The Officers argue that, in finding in the Officers' favor on the excessive force claim, the jury determined that Detective Lewis shot Cornish in self-defense, and therefore "necessarily concluded that Cornish realized and appreciated that the Officers were police officers prior to advancing upon [Detective] Lewis with a knife." Appellants' Br. at 33-34. They therefore contend that "Cornish's undisputed [conduct] in attacking [Detective] Lewis" was the "superseding cause of his death," id. at 39--and that there was no evidence that would have allowed the jury reasonably to conclude otherwise.

Kane responds, and the second district court agreed, that "[t]he jury had sufficient evidence to conclude that in the absence of a knock and announcement . . . it was reasonably foreseeable that a surprised Cornish may rush to the front door and take action in supposed self-defense and that a police officer may view that action as threatening and shoot and kill him." Appellee's Br. at 33. This view, however, does not accurately reflect either the applicable law or the facts of record.

Damages awarded under § 1983 for violations of constitutional rights are ordinarily governed by common law tort principles. See Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S.

13

299, 305-06 (1986).  "[T]he basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights . . . ."  Carey v. Piphus, 435 U.S. 247, 254 (1978) (emphasis added).  A plaintiff asserting a constitutional tort under § 1983 must therefore satisfy the familiar element of proximate causation.  See Murray v. Earle, 405 F.3d 278, 290 (5th Cir. 2005) ("Section 1983 . . . require[s] a showing of proximate causation, which is evaluated under the common law standard."); see also Shaw v. Stroud, 13 F.3d 791, 800 (4th Cir. 1994) ("[T]he causal link in § 1983 cases is analogous to proximate cause.").  Section 1983 tort defendants are certainly "responsible for the natural consequences of [their] actions."  Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)) (internal quotation mark omitted).  However, "[a] superseding cause [will] break[] the chain of proximate causation."  Lamont v. New Jersey, 637 F.3d 177, 185 (3d Cir. 2011); see also Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1996) (noting that "in cases brought under § 1983 a superseding cause, as traditionally understood in common law tort doctrine, will relieve a defendant of liability").  Specifically, the "subsequent acts of independent decision-makers . . . may constitute intervening superseding causes that break the causal chain" and insulate police officers from § 1983

14

liability. Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012).

In similar circumstances, the Third Circuit has held that officers are liable only for "the harm 'proximately' or 'legally' caused by [their illegal entry]" and not "for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995) (Alito, J.).[4] As such, officers who have unlawfully entered a home are not liable for "harm produced by a 'superseding cause'" or the harm caused by the officers' "non-tortious, as opposed to . . . tortious, 'conduct,' such as the use of reasonable force." Id. The Bodine court illustrated its view with a hypothetical similar to the facts before us:[5] if officers improperly entered a suspect's house without knocking and announcing their presence but--once the officers were inside and had identified themselves--the suspect broke away and killed two of the officers, a third officer would not "necessarily [be] liable for the harm caused to the suspect [in attempting to

_____

[4] The Fifth and Tenth Circuits have cited Bodine favorably. See Freeman v. Gore, 483 F.3d 404, 417 (5th Cir. 2007); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).

[5] Bodine involved police officers carrying out a custody order, rather than a search warrant. However, the court in Bodine noted that the "troopers' authority to enter the Bodine residence in carrying out the mandate of that [custody] order was similar to that of an officer executing an ordinary [search or arrest] warrant." 72 F.3d at 397.

15

disarm him] on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful." Id.

Other courts have also addressed § 1983 causation in similar circumstances and determined that a plaintiff's conduct was the superseding cause of harm when it precipitated subsequent harm caused by an officer's use of force. See James v. Chavez, 511 F. App'x 742, 750 (10th Cir. 2013) (unpublished) (concluding that, when a suspect was killed while attempting to stab a police officer, it was the suspect's "unlawful and deliberate attack on the SWAT team [that] constitute[d] a superseding cause of his death"); Estate of Sowards v. City of Trenton, 125 F. App'x 31, 41 (6th Cir. 2005) (unpublished) (holding that the suspect's "actions in threatening . . . officers with [a] handgun are what led to his injuries and death").

Turning to the record, we conclude that no reasonable jury could have found that the Officers' knock-and-announce violation proximately caused Cornish's death.[6] See Bodine, 72 F.3d at 400.

---

[6] The dissent states that "[i]t was up to the Officers . . . to prove that Cornish's advance on them was knowing and intentional, thus qualifying it as a superseding cause." Diss. Op. at 28. However, because "a superseding cause acts as an affirmative defense," id. (emphasis added), a defendant bears the burden of establishing this defense only after a plaintiff proves the proximate cause element of a § 1983 claim. Here, for
(Continued)

16

The evidence Kane presented at trial was insufficient to establish that Cornish did not recognize that the men in his apartment were police officers, and therefore that the Officers' illegal entry was the legal cause of Cornish's death. Kane presented the testimony of Cornish's roommate, Brad, who was not at home at the time of the search, and the expert testimony of Dr. John Adams, a physician and board certified pathologist.[7] Brad testified that the door to the master bedroom, which was old and had to be lifted before it could be opened, was open when he left the apartment approximately two hours before the search. See J.A. 481-83. He also testified that a bicycle and a stereo were located in the area where Officer Shorter stumbled to the right of Cornish's master bedroom door, J.A. 483; a crime scene photo indicated that neither item toppled during the confrontation. J.A. 205-06. Dr. Adams testified that he believed that Cornish moved "a foot or two . . . forward" in between the first and second shots before landing in the doorway between the living room and kitchen, and that he was unable to determine how fast Cornish was moving when he was shot. J.A. 688. Dr. Adams also testified that he could form only a "very

the reasons we explain below, Kane failed to show proximate causation, which ends our analysis.

[7] Dr. Adams was deceased at the time of trial. His deposition testimony was read into the record. See J.A. 680.

17

incomplete" opinion as to Cornish's position at the time of each shot, J.A. 684, and that he could not definitely conclude whether Cornish was holding a sheathed knife in his hand at the time of the first shot, although the knife was found under his body. J.A. 697. Drawing all reasonable inferences in Kane's favor, this evidence reveals nothing about Cornish's state of mind as he advanced on the Officers or his opportunity to recognize them as police.[8] Accordingly, Kane's evidence is insufficient to establish that Cornish's death was "the natural consequence[] of [the Officers'] actions." Malley, 475 U.S. at 344 n.7.

Moreover, the undisputed evidence establishes that Cornish must have recognized that the men in his apartment were police officers. It is undisputed that Cornish was found in the doorway between the living room and the kitchen. To reach that point, he had to travel more than 16 feet across an illuminated living room toward an illuminated kitchen in the direction of two police officers in SWAT gear who were shouting their

_____

[8] The dissent points out that, "at the moment [Cornish] heard the commotion at his front door, Cornish simply had no reason to expect . . . the police." Diss. Op. at 29. We agree, but that Cornish may have initially thought the intruders in his home were not the police has no bearing on the issue of whether, after then traveling more than 16 feet across the apartment, Cornish knew that he was advancing on police officers.

18

identity.[9]  On these facts, as the first district court aptly recognized, Cornish "must have known that the men in his apartment were police officers but advanced on them nonetheless, and . . . no reasonable jury could conclude otherwise."  J.A. 79.

Unfortunately for Kane, the strategic decision to abandon his claim for damages for emotional distress Cornish suffered during the period of time between the Officers' entry and Cornish's death constrains him here.  Kane is no longer able to

---

[9]  In concluding "that Cornish never had a chance to . . . properly identify the Officers," Diss. Op. at 31, the dissent does not account for critical facts.  The dissent states that an illuminated television set was the only source of light in the apartment.  But, as we mention above, the apartment's kitchen light was also on, providing an additional source of brighter light.  Given the layout of the apartment and the fact that the fatal shooting occurred when the Officers were in the kitchen and Cornish was in the kitchen doorway, this fact is critical. The dissent also relies on the fact that the Officers "were not wearing the traditional and easily recognizable blue police uniform."  Id. at 10.  All of the Officers, including Detective Lewis, were wearing clothing "marked 'police,'" J.A. 894, and some wore SWAT gear that included "military-style helmet[s] with goggles," J.A. 893, and "bulletproof vest[s]" displaying the word police "in bright white letters," J.A. 593, 638.  And aside from this distinctive clothing, the Officers were also shouting their identity as police throughout the encounter.  Finally, the dissent does not meaningfully account for how, in the time it took to cross 16 feet, Cornish could have failed to perceive the Officers' identity.  Although it may be the case in some circumstances that "[o]nce officers breach the door unannounced . . . it is too late to count on badges or other forms of notice to prevent the surprised and violent conflict with which the [knock-and-announce] rule is concerned," id. at 12, this is not true here.  The uncontroverted evidence shows that Cornish chose, for reasons unknown, to advance with a knife on people he knew to be police officers.

19

pursue recovery for that critical interval, which the claim itself recognizes existed.[10] Had those claims been presented to the jury, it would have been easier for us to find an evidentiary basis for a monetary award other than nominal damages.

Because Cornish must have known that the men were police officers, yet advanced toward them with a knife, his "unlawful and deliberate attack on the [police] constitute[d] a superseding cause of his death." James, 511 F. App'x at 750. In other words, the Officers' illegal entry was not the legal cause of Cornish's death; rather, he was "killed as a direct result of trying to stab a police officer." Id. Accordingly, Kane is entitled only to nominal damages to vindicate the deprivation of Cornish's constitutional rights on the knock-and-announce claim.

## B.

The Officers next contend that they are entitled to qualified immunity on Kane's knock-and-announce claim. We

---

[10] Kane's own recognition of the time lapse between the Officers' unannounced entry and Cornish's death refutes the dissent's contention "that Cornish never had a chance to reassess the situation and properly identify the Officers." Diss. Op. at 31.

20

disagree.[11]

The Officers argue that "the jury found that the Officers knocked and announced their presence at Andrew Cornish's door, but . . . also determined that the Officers did not 'properly' wait long enough before entering."[12]  Appellants' Br. at 44. They further contend that, at the time of this search, it was not clearly established how long "police officers must wait after knocking and announcing their presence before forcibly

---

[11]  The Officers also argue that they are entitled to statutory public-official immunity under Maryland law.  Unlike the objective analysis of federal qualified immunity, Maryland public-official immunity turns on a subjective inquiry into "malice"; an official may not be held liable even for objectively unreasonable conduct if it is undertaken without an improper motive.  See, e.g., Shoemaker v. Smith, 725 A.2d 549, 557-59 (Md. 1999);  Moxley v. Town of Walkersville, 601 F. Supp. 2d 648, 665-66 (D. Md. 2009).  However, we need not separately address the state-law immunity question here.  The parties agree that there is only one jury verdict, for $250,000, covering both the federal and state constitutional violations. See ECF No. 37-2 (letter memorializing agreement between the parties); J.A. 1112 (amended judgment).  And because state-law immunity cannot inoculate the Officers from liability for a federal constitutional violation, our holding that the Officers are not entitled to qualified immunity on the federal knock-and-announce claim is sufficient to impart liability for the entire verdict, without respect to the state constitutional claim. Moreover, under Maryland law the municipality--here the City of Cambridge--is responsible for the first $200,000 of damages on the state constitutional claim.  See J.A. 1110.  Therefore, given our holding limiting Kane's recovery to nominal damages, there will be no personal liability on the state-law claim in any event.

[12] We note that the jury verdict found that the Officers failed to "properly" knock and announce.  It did not include a temporal reference.

21

entering a dwelling to execute a narcotics search warrant, particularly where, as here, both an outer and inner door are involved." Appellants' Br. at 51.

Qualified immunity shields government officials from civil liability for § 1983 claims unless "(1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was 'clearly established' such that a reasonable person would have known his acts or omissions violated that right." Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011) (quoting Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006)). The knock-and-announce rule, in the absence of unusual circumstances not present here, is a clearly established right. See Wilson v. Arkansas, 514 U.S. 927, 931–36 (1995). Therefore, if the Officers violated the knock-and-announce rule here, they would not be entitled to qualified immunity.

The evidence substantiates the jury's verdict finding that the Officers "fail[ed] properly to knock and announce before entering [Cornish's] apartment." J.A. 1091. For example, the downstairs residents testified that they did not hear the Officers knock at the exterior door to the house, J.A. 285-88, 451-59, nor did they hear, though the walls in the High Street residence were thin, the police announce themselves at Cornish's door, J.A. 288, 457. And despite the Officers' testimony that

22

they used a battering ram to breach the outside door, Kane presented evidence that the glass portion of the door was unbroken. J.A. 547. As the first district court noted below, "[b]ecause the officers synchronized their entry into both [apartments], and because the walls were thin, the silence supports the proposition that the police failed to knock and announce before entering either apartment." J.A. 53.

Because there was sufficient evidence that the Officers failed to properly knock and announce their presence and the requirement is clearly established, we reject the Officers' argument that they are entitled to qualified immunity.

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.

23

PAMELA HARRIS, Circuit Judge, concurring in part and dissenting in part:

This case began with an anonymous tip of drug activity at 408 High Street in Cambridge, Maryland, a duplex in which Andrew Cornish ("Cornish") lived in the upstairs apartment. To investigate, the Cambridge police inspected the contents of trash bags left on the sidewalk in front of the residence. What they found, in bags associated with each of the two apartments, was trace amounts of marijuana and associated drug paraphernalia. Based on that discovery, they obtained search warrants for both apartments, and then assembled two Emergency Response Teams (commonly known as SWAT teams) — heavily armed, dressed in black, and carrying battering rams — to execute the warrants in the middle of the night. In Cornish's apartment, they recovered two bags of marijuana.

They also, as the majority recounts, failed to knock and announce their presence before breaking down the door to Cornish's home, as required by the Fourth Amendment. And no more than a minute later, in the confusion that immediately followed their unannounced 4:30 a.m. entry on suspicion of marijuana use, the police shot and killed Cornish.

After a four-day trial, the jury found that the officers who executed the warrant in Cornish's apartment (the "Officers") did not properly knock and announce before entering, and awarded

24

Cornish's father, Andrew Kane ("Kane"), damages of $250,000 for the death of his son caused by the knock-and-announce violation. Today, the majority sets aside that damages award on the ground that no reasonable jury could have found that the Officers' unlawful execution of the search warrant was a proximate cause of Cornish's death. I disagree, and respectfully dissent from that portion of the majority's decision.[1]

I.

The tort-law principles that govern this case are a matter of common ground. It is clear, as the majority holds, that the jury could award damages for Cornish's death only on a finding that it was proximately caused by the Officers' knock-and-announce violation. Indeed, the jury was so instructed by the district court, and the court's proximate cause instructions were never challenged by the Officers. And it follows that officers who unlawfully enter a home may not be held responsible for harm produced by a "superseding cause," or some unforeseeable intervening event that breaks the causal link between entry and ultimate injury. See, e.g., Massey v.

---

[1] I agree fully with the majority's disposition of the Officers' claim to federal qualified immunity and state-law immunity, as well as its determination that there was no error in the district court's instructions to the jury.

Ojaniit, 759 F.3d 343, 355 (4th Cir. 2014) (analyzing proximate causation in the Section 1983 context).

Finally — and this is the crux of the matter — there is agreement that an attack on the Officers by Cornish, if it were knowing and deliberate, would constitute just such a superseding cause and thus insulate the Officers from liability for Cornish's death. See Maj. Op. at 18.[2] Both district courts to review the case endorsed that premise, and for good reason. As the cases cited by the majority uniformly hold, when a resident reacts violently to an unlawful police entry, knowing full well that he is dealing with the police, that intentional act of aggression is a superseding cause of any resulting harm to the resident. See, e.g., Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995); Maj. Op. at 18. As the first district court to consider this case explained: "If Cornish knew that the intruders were the police when he advanced on them, there can be no recovery for his death," because the Officers are not liable "for harm produced by a superseding cause, such as an occupant's knowing decision to attack them." J.A. 53.

The pivotal question, then, is whether Cornish in fact knew that the men who broke into his home at 4:30 a.m. were police

---

[2] Citations to "Maj. Op." refer to the majority slip opinion.

26

officers — or, more precisely, whether the evidence presented at trial compelled such a finding. The majority answers that question in the affirmative, holding that based on the record evidence, "Cornish must have known that the men were police officers, yet advanced on them" with a sheathed knife anyway. Maj. Op. at 18. It is on that narrow but important point that we disagree. For the reasons outlined below, I believe there was ample evidence from which a jury could conclude that in the minute that elapsed after the officers unlawfully broke down his door and before he was shot, Cornish never realized that he was confronting the police.

## II.

## A.

Because we "accord the utmost respect to jury verdicts and tread gingerly in reviewing them," a party challenging the result reached by a jury — like the Officers here — "bears a hefty burden." Price v. City of Charlotte, N.C., 93 F.3d 1241, 1249, 1250 (4th Cir. 1996). We must view the evidence presented at trial in the light most favorable to Kane, the prevailing party, and draw all reasonable inferences in favor of the jury's verdict. Durham v. Jones, 737 F.3d 291, 298 (4th Cir. 2013); ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 472 F.3d 99, 113 (4th Cir. 2006). And we cannot

27

reject the jury's conclusions simply because we would have reached different ones: "If reasonable minds could differ about the verdict, we are obliged to affirm." King v. McMillan, 594 F.3d 301, 312 (4th Cir. 2010).

In applying this standard, we must keep in mind that it is the Officers, not Kane, who bore the burden of proof on the dispositive question. In tort law, a superseding cause acts as an affirmative defense, and the defendant bears the burden of proving its existence. See In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21, 45 (1st Cir. 2013); Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 773 n.4 (3d Cir. 2009); BCS Servs., Inc. v. Heartwood 88, LLC, 637 F.3d 750, 757 (7th Cir. 2011); Beck v. City of Upland, 527 F.3d 853, 863 (9th Cir. 2008). It was up to the Officers, that is, to prove that Cornish's advance on them was knowing and intentional, thus qualifying it as a superseding cause — and not Kane's obligation to prove otherwise. So whether Kane's evidence on Cornish's state of mind at the crucial moment is inconclusive, Maj. Op. at 18, is beside the point. What matters is whether a reasonable jury could have found that the Officers' evidence was

28

inconclusive, and that they had failed to prove that Cornish was aware of their identity before he died.[3]

B.

Drawing every reasonable inference in favor of the jury's verdict, as we must, I can find no reason to second-guess the jury's judgment on this score. For three principal reasons, I believe there was more than sufficient evidence from which a reasonable jury could have concluded that Cornish need not have known that the men who forced their way into his apartment at 4:30 a.m. were police officers, and could have died while running toward his door to investigate the source of the violent break-in.

First, at the moment he heard the commotion at his front door, Cornish simply had no reason to expect that it might be

---

[3] As Bodine and all of the other precedent cited by the majority make clear, the existence of a superseding cause is the only proximate-cause question in this case and cases like it. See Bodine, 72 F.3d at 400 (no proximate causation because resident's reaction is superseding cause); see also Brief of Appellants at 38-41 (citing Bodine and cases following it to argue against proximate cause solely on the ground that Cornish's knowing attack on Officers was a superseding cause); J.A. 53 (district court holding that Officers cannot be held liable for Cornish's death if Cornish's reaction qualifies as a superseding cause). Because violence in the wake of an unannounced home entry is eminently foreseeable, see Hudson v. Michigan, 547 U.S. 586, 594 (2006) (explaining rationale for knock-and-announce rule), the standard for proximate cause is met unless the Officers can show the existence of a superseding cause that will insulate them from liability.

the police.   Indeed, thanks to the knock-and-announce rule, he was entitled to and likely did assume the opposite: that if somebody was coming crashing into his home at 4:30 a.m. without knocking and announcing, it must be someone other than the police.

Certainly there is nothing about the facts of this case that would have deprived Cornish of the right to rest on that presumption.   Cornish was not some drug kingpin who might be on notice as to the possibility of an unannounced police raid.   On the contrary, Cornish enjoyed a cordial relationship with the police; one of the Officers testified that while on duty he would occasionally stop by Cornish's building and share a Pepsi with Cornish on the front porch.   And as noted above, as to Cornish, this was a case about trace amounts of marijuana found in a trash rip, which ultimately led to the seizure of a small quantity of marijuana in Cornish's apartment — not exactly the stuff of no-knock nighttime SWAT raids.

The point, to be clear, is not to take issue here with the Officers' decision to execute a search warrant based on marijuana traces by way of a military-style nighttime raid.   All that matters for this case is that Cornish could have had no reason to expect such a raid, and that the jury understood as much.   As a Cambridge police officer testified, the department typically does not execute narcotics warrants at 4:30 a.m., and

in cases involving marijuana use, typically does not seek warrants at all.  J.A. 812–13.  Add to that the fact on which the jury verdict rests — that the Officers failed to knock and announce their presence before breaking down Cornish's door, as they were required to do by law — and the jury very reasonably could have concluded that Cornish would have presumed that the intruders in his home were not the police.

Second, the events in question unfolded so quickly, and under conditions so conducive to confusion and mistake, that a jury readily could find that Cornish never had a chance to reassess the situation and properly identify the Officers.  This was no drawn-out encounter between police and suspect, giving each the opportunity fully to appraise the situation, as in many of the cases cited by the majority.[4]  According to Officer testimony, this encounter lasted for all of one minute — one minute, possibly less, between the first bang on Cornish's door and the final shots.  J.A. 884.  Cornish, who was in his bedroom and presumably asleep, had one minute to wake up, register and

---

[4] See, e.g., James v. Chavez, 511 F. App'x 742, 743–45 (10th Cir. 2013) (resident who responded to officer approaching his home by waving a knife and forcing his daughter to stay inside the house is ultimately killed in standoff with SWAT team); Estate of Sowards v. City of Trenton, 125 F. App'x 31, 33–34 (6th Cir. 2005) (officers chased resident to the door of his apartment, interacted with resident at door; resident stated that he had a "surprise" for the officers and pointed a gun at them when they entered).

31

assess the commotion, decide how to respond, and then, as the majority describes, find a sheathed knife and cross the approximately 16 feet between his bedroom and the area near the front door, where he was shot.  Even under the best of circumstances, that does not leave a lot of time to discern and comprehend all of the details.

And these were decidedly not the best of circumstances.  It was, for one thing, the middle of the night.  The jury certainly could have inferred that Cornish, likely awakened from sleep, would have been startled, confused, and frightened.  Though the Officers testified that the living room through which Cornish traveled was "illuminated," to use the majority's word, by a small tube-style television left on when Cornish retired, it was dark enough that at least one of the Officers took the opportunity to turn on a flashlight after the shooting, and another testified that he may have been using the light attached to his gun.  And the Officers, by their own testimony, were moving rapidly and shouting loudly, making the situation volatile as well as confusing.

Those are precisely the circumstances — "tense, uncertain, and rapidly evolving" — under which we give police officers the benefit of the doubt when it comes to their perceptions. Graham v. Connor, 490 U.S. 386, 396–97 (1989).  In evaluating the use of force by officers, we make allowances for the fact

32

that such situations can be exceptionally confusing and fast-moving, with officers required to make split-second judgments under suboptimal conditions. See id.; Waterman v. Batton, 393 F.3d 471, 478 (4th Cir. 2005); Anderson v. Russell, 247 F.3d 125, 130–31 (4th Cir. 2001); Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). In the context of a rapid-deployment and high-pressure nighttime raid, police officers cannot be held to "the 20/20 vision of hindsight," Graham, 490 U.S. at 396, and must instead be judged under a more forgiving standard.

Indeed, the Officers here argued as much to the jury, in defending against Kane's claim for excessive force. According to the Officers, for instance, events in the apartment were so fast-moving and conditions for observation so poor that they could not discern — nor be expected to discern — that what Cornish held in his hand was a knife in a sheath and not, as they thought at the time, an unsheathed knife, or perhaps a machete or a pipe. The jury apparently credited that account, and decided the excessive force claim against Kane. There is no reason I can think of that the same jury could not apply the same standard to Cornish — who, unlike the Officers, had the benefit of neither training nor advance warning when he found himself caught up in the tumult of a military-style nighttime raid — and assume that Cornish, too, would be unable to exercise

33

the powers of careful discernment that could be expected under less fraught circumstances.

Against all of this, the majority posits that the Officers' SWAT apparel necessarily would have alerted Cornish to their identity.[5]  But we are not talking, of course, about the traditional and easily recognizable blue police uniform.  These Officers were clad all in black, for stealth rather than ease of identification.  The Officer who confronted and shot Cornish — of the four, the Officer whose appearance is most crucial here — was not in fact dressed in SWAT gear, J.A. 893, but rather a black sweatshirt or t-shirt, and his badge was the only police marking he testified to wearing, J.A. 593.  One of the other Officers testified that he, too, was without a helmet, and instead wore a baseball cap, as well as a black sweatshirt with a police "emblem" on the left breast and a vest with a "police patch" on the right.  J.A. 554.  Another testified that in addition to a military-style helmet and goggles, he wore a vest that somewhere displayed the word "police," J.A. 893, from which

---

[5] The majority also points out that the first district court to consider this case on the pleadings concluded that Cornish "must have known that the men in his apartment were police officers."  But surely it is at least as significant that the second district court — the one that presided over the four-day trial in this case and heard all of the evidence and testimony — came to the opposite conclusion.  See Kane v. Lewis, 989 F. Supp. 2d 468, 469–70 (D. Md. 2013).

the jury could infer that he had in mind the same "police patch." And the single Officer who testified that he was wearing a vest with the word "police" in "bright white letters" was, by his own account, out of Cornish's sight during the entire encounter. J.A. 646. From this evidence, a reasonable jury could have concluded that the Officers had not met their burden of proving that, in the heat of the moment and by the light of a television, their patches or badges or any other identifying features would have been visible and recognizable to Cornish.

Nor, it bears noting, should it be at all surprising that police officers might find it difficult to convey their identity in the confusion that inevitably follows an unannounced home entry. That is precisely the point of the knock-and-announce rule, which recognizes that "an unannounced entry may provoke violence in supposed self-defense by the surprised resident." Hudson v. Michigan, 547 U.S. 586, 594 (2006). There is a reason we have a knock-and-announce rule and not, say, a wear-a-badge rule: Once officers breach the door unannounced, as the tragic facts of this case make clear, it is too late to count on badges or other forms of notice to prevent the surprised and violent conflict with which the rule is concerned.

Third and finally, there is the credibility of the Officers' trial account, in which Cornish knowingly advanced on

35

the Officers. It is the province of the jury, of course, to weigh the credibility of trial witnesses. See United States v. Dinkins, 691 F.3d 358, 387 (4th Cir. 2012). And here, that credibility was very much at issue during the trial, given that the Officers never conceded the knock-and-announce violation found by the jury. For instance, the Officers testified that they gave Cornish a form of notice by forcing open the exterior door to his building with a 25-pound battering ram, generating noise he would have heard from his upstairs apartment. On the other hand, the exterior door showed no visible signs of any damage, and Cornish's downstairs neighbors testified that they never heard any noise at that door. The district court specifically instructed the jury that it could consider this evidence for purposes of "judging [] the credibility" of the Officers, J.A. 1062, and we should assume, drawing all inferences in Kane's favor, that it did exactly that.

A reasonable jury also could have considered the inherent plausibility of an account that had Cornish knowingly advancing on a heavily armed SWAT team while carrying a knife still in its sheath. This, too, was a major focus of the trial, with Kane arguing throughout that imputing awareness of the Officers' identity to Cornish simply "defies common sense." J.A. 972. The jury knew that Cornish had a cooperative and friendly relationship with the police, that he suffered from no mental

36

infirmity, and that he was not under the influence of drugs or alcohol on the night he died, and it was free to infer that he would have had no reason to take on the Officers had he known their identity.

To be fair, the jury also had the benefit of the Officers' response to Kane's argument from common sense: "[P]eople do [] irrational things." J.A. 996. But it was not incumbent on the jury to find that explanation compelling. Viewed in the light most favorable to Kane, the evidence at trial allowed for a different conclusion, which a reasonable jury might find more plausible: that because the Officers failed to knock and announce before entering Cornish's apartment at 4:30 a.m., as required by law, Cornish died before he could identify the intruders he was confronting as police officers.

That precise sequence of events — a surprised and defensive reaction by a resident, to which the police respond with force — is exactly what the knock-and-announce rule is intended to prevent. Hudson, 547 U.S. at 594; see also McDonald v. United States, 335 U.S. 451, 458–61 (1948) (Jackson, J., concurring). To my mind, the jury's verdict in this case represents a substantially supported and eminently reasonable effort to hold police officers accountable for an unnecessary death — one that could have been avoided had the Officers complied with their Fourth Amendment obligation to announce themselves before

37

breaking into Cornish's apartment in the middle of the night.  I would not disturb the jury's verdict in this case, and would affirm the district court's judgment in full.